First, the meaning of intentional discrimination. Second, how Mr. Francois presented a genuine issue of material fact. And third, I'd like to briefly touch on two of the defendant's most salient points. First, what is intentional discrimination? Intentional discrimination is not actually written into the text of the Americans with Disabilities Act or the Rehabilitation Act or the Affordable Care Act as a requirement. It has been inferred to be a requirement through a series of cases, starting with I believe it was the Carter case and then most importantly in the Delano Pyle case from 2001, where the Fifth Circuit said that intentional discrimination is required and that there is no deliberate indifference standard applicable to the Americans with Disabilities Act. In the district court and to this court, Mr. Francois argued that this case, Delano Pyle, is extremely important in what the court should be looking at. And it's not because the facts of that case are exactly analogous to this situation. It's because that case stands for the law. That case stands for what constitutes intentional discrimination. And in Delano Pyle, the deaf plaintiff never actually requested an accommodation. Instead, he was arrested by a police officer during a traffic stop. He was deaf. The officer attempted to communicate through a loud voice and later at the station through a blackboard. The plaintiff didn't feel this was sufficient. He filed suit. Case went to trial. Plaintiff won. Fifth Circuit sustained. And so in that case, the plaintiff never actually requested an interpreter. Instead, his need was obvious. It was open and obvious, right? And so when we look, what does intentional discrimination mean? It can mean it's obvious to the defendant's request is made by the individual, or because it's obvious from the circumstances, right? It's open and obvious based on what is occurring. And it's very important to understand and have the proper law in mind when moving on to what are the material dispute of facts, because only with the appropriate law can the appropriate material dispute of facts be evaluated. Well, are you contending that whenever you have a deaf person in a custodial situation that there has to be a sign language interpreter? We are not saying it has to be in every situation you are. It's going to be varied by the circumstances. Did Mr. Francois, I mean, Mr. Francois, got interviewed or at least discussed his situation with, I think it was Mr. Miller, the day after he arrived at the hospital? Maybe Mr. Deshotel? Deshotel. I don't know. Yes. So he did have a conversation with Mr. Deshotel. I will note that Mr. Francois' grandmother, it's in the record that she asked for an interpreter the day before. So then Mr. Deshotel shows up, and he is speaking sign language because he knows some sign language himself. Mr. Francois at that point did not ask for an interpreter. But an interpreter had already been requested beforehand. So at that point, the hospital already knew he had this need. He is deaf, and he has this ongoing issue. It's not like his disability status or his need magically changed by just him not making a statement to Mr. Deshotel. According to Mr. Deshotel's affidavit, didn't he say that Mr. Francois could contact him anytime he needed that kind of assistance? He did say that, yes, Your Honor. And in this circumstance, whether Mr. Francois should have done more is ultimately a question of fact for the jury. Because here, Mr. Francois put into evidence that his grandmother asked for an interpreter on the first day, that he is obviously illiterate, that his grandmother told the staff that he wasn't going to understand what they were writing on the whiteboard. And then on days April 13th, 14th, 15th, no interpreter, no sign language interpreter whatsoever. So should Mr. Francois have done more? Maybe. But that is an inference that should be drawn by the jury, as I'll discuss more in a second. Under the Fifth Circuit case of Perez, inferences are for the fact finder, not for the court. And so whether he should have done more— So both times, I mean, he asked—his grandma asked for it, they send Desotelin the next morning. And then a few days later, his friend or whoever she was asked for it, and they—I mean, there's an entry, the nurse immediately goes and requests another signer, and then—I think then you agree the signer was adequately provided for a number of days. So it's hard—you're saying they knew—to show intentional discrimination, you have to show they knew he needed an interpreter and didn't provide it. But yet there's these two cases where it was requested and they promptly provided it. Right. And so whether the—first of all, I would say that the second request was made by Ms. Paulus Rodriguez on the 14th. They didn't get the interpreter until the 16th. So there is, again, almost a full two days there. But there is—you know the nurse's record I'm talking about, where she immediately leaves and goes and—is there anything about—are these on-site sign language people? Do they have to call them in? What's the record say? So there are two different ways that accommodations can be provided. First is through an in-person interpreter that would come to the hospital for a specific amount of time, say a one-hour, two-hour window. There's also what is known as a video remote interpreting. It's a device on an iPad, and it can be used to hail the interpreter very quickly. So look, Mr. Francois is not— What did he get when he started getting frequent sign language? When he frequently started—I believe he got the in-person interpreters where they would come for— Were they a staff member of the hospital, or were they bringing him in from outside? They're an outside agency, an outside contractor. And that's the point, is that Mr. Francois is not saying that he needed an around-the-clock, 24-hour interpreter here. He's saying that during those days, between the 12th, when the guest arrived, there was an obligation. That is clear language from case after case. The Federal ADA Rehabilitation Act, Affordable Care Act, imposed an affirmative obligation to accommodate. Didn't they attempt the video remote interpreter during that period? I believe they did at one point, and it did not work, which again shows that they knew that he needed accommodations, but they did not provide them. And it kind of segues into the medical records, right, which these medical records say that they wanted to take a medical history, and it says history limited by communication. Well, they're trying to take a medical history of an individual who's just been shot, a gunshot wound victim, and they need to take his medical history. And what did they do at that point? Did they go and get the interpreter or get the video remote interpreter to accommodate? No, they just wrote down history limited by communication and moved on. Again, what inference should be drawn from that ultimately by the jury? That's a fact question, but not something we would contend that is appropriately drawn by a district court. Just for my information, how old was Mr. Francois? Mr. Francois, I believe, was 19 years old at the time. He has an extremely limited education, and our expert testified that Mr. Francois, she did a full assessment and determined that he had a first grade at best reading and writing level. And the expert evidence is actually very key because the district court very summarily dismissed it, but the expert evidence can be relied upon by a jury to determine that the defendant's agents didn't actually, that they knew he needed alternative accommodations. And I think if you think about it, the defendants have argued and the district court agreed that an expert cannot comment on the subjective state of mind of those employees. However, it can happen all the time where you can have, say, in a car crash criminal case, you could have a defendant driver say, I didn't think I was speeding, no way. And then you could, on the other hand, have an expert and say, I've measured the roadway, I've measured the tire marks, he was going 80 miles per hour in a speed zone, there's no way he didn't think he was speeding. It's then up to the jury to decide between those two competing narratives. Same thing here. Dr. Judy Shepard Tegel, a linguistic expert, testified that Mr. Francois, based on her assessment, has a first grade reading and writing level, and she testified it would have been wishful thinking for the medical staff to believe that Mr. Francois was communicating medical information. Which the jury should believe with those two narratives, that's up for the jury, but it's not something for the court to decide on a motion for summary judgment. And so that's not a fact issue of how fast the person was going, to use your analogy. It was the actor that's relevant, aware of, to shift back to our case, of the communication problems. And you don't have intentional discrimination unless a fact finder, unless there's a genuine speed material fact as to whether these people were aware that the communication was not You're not saying 24-7 or 24-5, I guess, in this particular situation. But when communication, I mean, is there evidence here that they're aware that he did not understand anything they were doing? Or that he would only need an interpreter when particularly significant detailed information had to be transmitted? So I certainly wouldn't contend that they didn't understand anything. You know, that's not something we are arguing or have argued. You know, there was the whiteboard and there was some amount of communication that occurred. I think it's very nominal, but some did occur. The question is, was Mr. Francois afforded an opportunity to communicate about his history, his diagnosis, his prognosis, that sort of thing during those five days? That's what we're saying, no, he was not. He was not afforded that opportunity. And we saw in the medical records him saying, history limited by communication. Well, that means that they couldn't take the history, right? At least that's a reasonable inference that could be drawn from those facts. And instead of going and getting an interpreter or getting the iPad, they just wrote this down in their notes and moved on. And so what should be drawn about their mindset is very key in this case, but we would suggest that there is substantial evidence to say that the jury can find one way or another, and it was error for the district court to say, well, definitively, this is what should be drawn. And I think that kind of comes back to the Perez case where the Fifth Circuit said that inferences are the fact finder and are generally inapplicable for the court. And so that's kind of where we're at, is that this was basically inapplicable and not what should be done at the summary judgment stage. I'd also point out that there was evidence about policy violations, which are very material and germane to this case. The defendants have a sign language, or just they have an accommodation policy in general, and the policy says that the defendants shall provide, I can pull up the exact language here, that interpreter services will be provided in all necessary circumstances when there is a need for complex diagnostic or treatment information to be communicated effectively with sensory impaired patients. And that's on page 1621 of the record docs. And why is this relevant? It's relevant because the defendant's staff weren't just confused individuals that didn't know what they were supposed to be doing. They had knowledge about, they were trained on this policy, the policy can be located easily within the defendant's programs and systems. So again, this is not a situation where, as in Kadena, the Fifth Circus said that staff confusion doesn't evidence intentional discrimination. But these people weren't confused. They knew what they were supposed to be doing. They were trained on it. They were obligated to follow this policy. And here, was complex information discussed? Well, medical history would certainly seem to be complex information. In fact, the policy explains that as one possible type of complex information under the policy. So if defendant's staff were operating in violation of their own accommodation policy, that could lead to an inference of intentional discrimination. Now, maybe the jury will... Let me ask you about the medical records or medical history piece. There is a regulation that you've cited, probably both sides cited, that it's improper to rely on the family, at least for some aspects of this. It seems to me on medical history, quite often other people are providing that kind of information, particularly somebody badly injured, whatever else. How does that regulation limiting getting necessary information from somebody other than the patient, or at least from the family, how does that fit in to the medical history piece? Sure. I think how that fits in is that the ADA regulations provide contours for what does and does not constitute discrimination and what should or should not be done. And here, we're not saying that someone can never talk to the family member of a deaf person, but the regulations are designed so that deaf individuals and others with disabilities are included in their own care. I mean, if you think about it in this circumstance, we have a 19-year-old male with his grandmother. There are certain things in his life that he may not want, he may never share with his grandmother. No, that regulation is stupid, but that's just my personal opinion, not a legal conclusion. But there's nothing in this record about the hospital having violated that regulation, is there? I think where that regulation came in was in the briefing was that part of what the district court drew upon was a finding by Judge Dick that Ms. Deamer, the grandmother, aided with the interpretation, and neither party actually briefed that issue to the district court about the grandmother. Right, because there's just no contention that the hospital tried to substitute a family member. I mean, you know, anyone, and when I say that, what I mean is anyone who's ever had a relative in the hospital or even a friend who's very ill knows that that person is not fully capable of being his own advocate and they need someone. So, anyway, I don't care whether they're deaf or whether they have 150 IQ, they need someone, but anyway, that's just not material to this case. Well, the only way I think it's material is in the relation to that finding of the district court that they were interpreting. You know, the last point I'd like to respond to briefly of the defendant's arguments is they make a big deal in their brief about the fact that Mr. Francois was accommodated you know, numerous times once he was transferred to the rehabilitation unit. However, the simple fact is that the Americans with Disabilities Act in the case of the 10th Circuit case of Hamer versus the City of Trinidad, a violation that can occur any day that, you know, a service is inaccessible, and that's the same thing here, is that the law has to be complied with at all times, regardless of whether you're committing speeding or anything. Do you have a claim for injunctive relief? The claim for injunctive relief was abandoned on appeal. Okay. Just trying to clarify. Thank you. You have time for rebuttal. Mr. Williams? May it please the court. My name is Doug Williams, and along with Drew Grimione, I represent our Lady of the Lake Hospital. When faced with this motion for summary judgment, plaintiff was required to come forward with evidence sufficient to establish the essential elements of his claim.   The evidence must be of the quality and quantity necessary to establish those facts at trial. Speculation, conjecture are simply not enough, and quite frankly, plaintiff's entire argument and opposition was filled with a lot of speculation but no real evidence. The reality is that plaintiff's obligation here was to prove that there was intentional discrimination. Now, what are the undisputed facts in this case? The night of April 11th, Mr. Francois was brought to the hospital on transfer from another hospital, because our Lady of the Lake Hospital is the trauma one level unit in the city of Baton Rouge. This man was not going to have communications with anybody that night, whether he was a hearing patient or a deaf patient. They were rushing him to surgery, they were trying to save his life, which they did save. So, what happens that night? Does the grandmother make a comment to somebody she described as at a desk that her son uses an interpreter? I don't know. She says she did. But that night it didn't matter, because there was no interpreter there, there was no interpreter that was going to be used, this gentleman was in an emergent situation, and he was taken emergently to surgery. So, in the light of that information, what happens? The following morning, John Desitel, early that morning, goes into the room. John Desitel doesn't know a little bit of sign language. John Desitel grew up as the greatest command of the language, and they are bilingual. And he made it very clear it was a second language, and that is in his declaration. He goes into the room, he begins to sign with Mr. Francois. And he starts off with, here's who I am, here is my role at the hospital, I am on this floor. My role is to make sure you get the services you need, my role is to make sure you understand we want to deliver those services. Well, I think, you know, that affidavit is very convincing, but you do sort of wonder why he never showed up for the next three or four days. Well, you have to keep in mind, Mr. Desitel's role is not as an interpreter, because he was not interpreting that day, he was communicating, he was having a discussion. What's his formal job? He's called the care coordinator. A what? A care coordinator. He makes sure that the things that are, he is not an interpreter on the staff. An interpreter interprets between one person and the deaf person. That sounds like, you could have made bureaucracy to me, but whatever. Well, honestly, Your Honor, that's the federal regulations. Honestly, we can't put somebody in that position. Really? Yeah. Oh, my goodness. They have to be qualified, is what the statutes and the regulations show. Now, I do believe he's qualified, but I think it's been very clear we don't put those folks in that role. So, what happens at this point? Mr. Francois has a discussion, in the presence of his grandmother, with Mr. Desitel, both speaking and signing. So, Ms. Deamer is hearing it, and Mr. Francois is seeing it through sign language. If you need anything, let me know. I'm the only guy named John on this floor. If you need anything, if you need, first off, do you need any additional services now? The answer is no. If you need any additional services, let us know. Ask for me, I'll be back in. We'll make sure we get you the services that you need. Now, what's interesting is this. Over the next three days, and I keep hearing five days, he came in on the 11th, the morning of the 12th, Mr. Desitel is there, it is the afternoon of the 15th that Ms. Rodrigue comes in, so it's slightly over three days is what we're talking about. Over those three days, Nurse Berry, Nurse Faraci, and Nurse Welch all go into the room and at various times communicate in writing. It is clear that he understands. He's shaking his head and nodding appropriately. When asked or when told, I am here to give you your shot in the belly, what does he do? He lifts his gown so that the shot can be administered in the belly. He clearly understood those communications. His own grandmother acknowledged seeing him write back to hospital personnel. Did the grandma have a deposition or an affidavit? A deposition, Your Honor. His own grandmother admitted seeing him write back to the hospital personnel. Now, during that three days, neither he nor his grandmother make any request for other communications. Judge, I believe it was your point about isn't the real issue what does the hospital know? These hospital personnel all felt that they were communicating appropriately. Their affidavits, their statement, their deposition testimony all make that abundantly clear. What about the statement that whatever it means, it does seem a bit ambiguous, difficult at getting the patient history? Well, I will point to this, Your Honor, and I think this is perhaps some misconstruction. The patient history is a doctor-patient issue. A history in physical is not a nursing action. It is a physician action. That's what they tried to do in the emergency room, the trauma center that night. As Judge Jones indicated, you're going to go to the family members who are there, whether you are a hearing patient, whether you are a deaf patient. When you have been shot, when you have been paralyzed, they're going to turn to the family to get the information because, quite frankly, the patient is in no condition to do that. Now, the other things that I found interesting is he talks about our staff, and I think he's referring to our nurses, giving diagnostic and prognostic information. Absolutely not. All of the things that are on the page that he cited to you in the record, bear with me just one, I left it on the table, I think. Ah, no, here it is. Obtaining a history in physical. That's a medical discussion with a doctor. That's what makes it a complex discussion. Discussing diagnosis and treatment plan. That is a physician discussion. In fact, nurses by their licenses are prohibited from discussing diagnosis and prognosis. That is a medical discussion. It is a matter of law that nurses cannot and do not have those discussions with patients. So the suggestion that they did is simply not in the record, not supported by anything other than idle argument in this case. So, the indication, most importantly, is they express no dissatisfaction. So on April 15th, Ms. Rodrigue shows up and tells our nurse, he's not understanding. And Judge, I think, Costa, I think you referred to the note extremely clear. This is the first time I'm hearing this. I checked with the other nurse on the floor, first time she's hearing it. And what do they do? They arrange to have an interpreter in person there the next morning when the complicated discussions may go on. What's really interesting is this. What is there missing from this record? Any indication that there was any sort of complex discussion during those first three or four days that required an interpreter? And in fact, our own witness, Ms. Whittier, made it very clear. The record indicates they were waiting because nobody knew exactly what was going on at that point. They didn't... Does she recognize the hospital's actions as careless or negligent? I don't think she called them negligent, but I think what she did say is if they are negligent, that's still not enough. Even if they are negligent, that is not enough to rise to the level of intentional discrimination. Now let's talk about intentional discrimination in some of the cases he cited. The Perez case, intent involves purposeful action. There is no evidence of that. I think in general, yes, Judge, I do agree with that. If there was in fact evidence that my nurses knew he was not understanding and they blew him off, the problem is, I'll suggest to you this, they didn't blow him off. They went in with writing tools. Because keep in mind, there are multiple levels of aids, auxiliary aids that can be used. And I think the law is very clear. If we try to use an auxiliary aid, the fact that that aid doesn't work doesn't mean that we discriminate it. Now, if we take your hypothetical judge and let's say we go in and we try to write and it's clear that he doesn't understand, then perhaps at that point there may be an obligation to elevate it if it is a matter that is a complex and lengthy discussion that needs that kind of involvement. Now again, keep in mind, Mr. Francois admits, I have the ability to write and type, because he was on his phone typing quite a bit and that's in the record. I have the ability to write and type, I don't understand. Or maybe just question mark, question mark, question mark. He didn't do any of that. At no time. And what's really interesting is if you look at his, not only his deposition, but look at essentially the affidavit, the statement that he attached in opposition to our motion for summary judgment. He talks about, I felt this, I felt that. He never once says in that declaration, I communicated to them, I made it clear to them, I showed them I didn't understand, I shrugged. Let's talk about shrug for a second. They referenced the grandmother saying he shrugged. In the record, and I think it's very clear when you look at Judge Dick's opinion, she understood and agreed with our position, I tried to explore what do you mean he shrugged and when did he shrug? And she ultimately said, I don't know when she shrugged, I may be confused, it may have been at the other Lady of the Lake Hospital, he ultimately went back to Baton Rouge General for some long-term treatment over there. So when she mentioned he shrugged, we don't know what the nature of the communication was, we don't even know that it happened at our Lady of the Lake Hospital. She said, I saw him shrug once, but when I questioned her, she didn't know when, where or how. So there's no evidence of purposeful action in the face of knowledge that he was not understanding. There's no evidence that in fact we were on notice that he didn't understand things. Let me, one point that maybe you mentioned more than once or maybe just stuck with me by your opponent, without an interpreter, this is from the opening brief by the appellants, without an interpreter, Mr. Francois did not understand he was paralyzed or wrongly believed he would have surgery and walk again. And that, I didn't look at the record, some footnote aside, I don't know what that's in. What is that in, if you know what I'm referring to? And secondly, what, what importance, what importance should we give to that statement? Honestly, I don't think any, because one, he doesn't indicate that he conveyed that in any way, shape or form, or again, ever notified us that he didn't understand the communications that were going on. More importantly, Your Honor, and I think this is critical to this analysis, is that there's no evidence that in the first three days, any of the doctors were prepared to go in and tell him you are paralyzed and that is a permanent condition. Because as our expert indicated, that wasn't the case at the time. They were in a wait and hold. They wanted him to be stabilized. They did not know the extent. There is no evidence, this is the thing that I struggle with, the suppositions in their argument. There is zero evidence that any doctor attempted to go in and tell him you are paralyzed and that's going to be the way it is the rest of your life because they weren't prepared to do that. And any suggestion that our nurses did that, one, is not supported by the record and two, would be contrary to the Nurses Practice Act and the licensure in Louisiana. My nurses would never do that and they didn't do that in this case. Again, it's sort of a supposition, but there's no evidence. What's really interesting is, he says he didn't understand that, but he doesn't say there was ever a communication during that time to try to convey that to him because there simply wasn't. Were doctors meeting with him daily in these first few days? There were some meetings with the doctors, but they honestly were very basic. All indications are communications in writing on very basic things. They'd be doing rounds and they'd Correct, there's examinations, there's basic communication, but there's no complex diagnostic prognostic communication going on and there is simply no evidence in the record that there was because it wasn't happening. Was he in a regular room or ICU? No, he was actually in a regular room at the time. They were waiting to stabilize him and what happened is this. Actually, and I may be off by a day, either on the 15th, excuse me, either on the 16th or 17th, he was transferred to rehab and he remained there for about a month. As you know, Ms. Rodrigue came in, there was a person provided the other day, the following day. The irony of all of this is because of the plan to transfer to rehab, and this isn't in the record, but the irony of it all is my nurses were already working on that because they knew once he got to rehab there was going to be long-term engagement, teaching, things of that nature. But the evidence, even in the absence of that, is this. Ms. Rodrigue came in for the first time, my nurses are being told he's not understanding, and my nurses immediately, immediately get on it and arrange to have an interpreter there the following morning when the doctors are making rounds. We've talked about the complexity. So let's, I think we've addressed the policy, he talks about complexity, he talks about diagnosis, that's simply not a nursing function. It is not anything the nurses did. So what is intentional discrimination? It requires some intent, some purposeful action. Is it deliberate indifference? I will admit there's some question in my mind where the standard is. There's one of the cases that says it seems to be something more than deliberate indifference, but the reality is this. Whether it's deliberate indifference or something higher, something more than that, their evidence simply does not suggest any amount of deliberate indifference by any of the nurses, by any of the staff, by anybody, and it's just simply not there. The irony is, I believe he's actually trying to lower the standard, and judges, one of you all asked the question, do you get it 24 hours a day? No. But interestingly enough, he really does seem to be saying when you look through the argument, and you get to the lack of facts in this case, what he really appears to be saying is that I had a client who came in disabled, or deaf with a disability, and so it was incumbent upon you to figure out everything about him, whether he asked for it or not, whether you communicated with him in his native language or not. You had to guess, and I think it's the Wyndham case. Native language, you're talking about American sign language. Correct, correct. When I say native language, it's what... I just wanted to make sure it wasn't Cajun or something. No, Your Honor, that's correct. I think it's one of the cases we've recited to you, Your Honor, and I'll tell you which one it is, is that it's the Wyndham case. We don't have to be clairvoyant, and it's just simply impossible for us to be clairvoyant. The Fells case, there's no evidence that we knew there was harm to a federally protected right. A few points. They brought up Ms. Cagle, this language expert. Ms. Cagle did not review any of the communications between the hospital and Mr. Francois. She did not read Mr. Francois's deposition. She did nothing that has anything germane to do with this case. The Delano Pyle case, the police officer ultimately acknowledged, yeah, I didn't really... I wasn't sure he was understanding me. I got it. I never really felt he was fully understanding me. Well, that's why there was a violation, because he admitted his subjective impression was that there was no understanding. The Perez case, the hospital admitted our policy is defective, and that's what led to the decisions in those cases. So let me talk to you a little bit about Hamer, which I find interesting. Counsel cites Hamer, which is actually his case, for the proposition that Hamer says you can have a moment of discrimination. Well, that may be true, but that's not what Hamer says. Hamer was a statute of limitations case. In Hamer, there was no dispute that there were violations. There were over 70 locations in the city where there were violations of the standards that were applicable for wheelchair accessible ramps, that sort of thing, at corners on intersections. What Hamer was about was Hamer was a case that was about the continuing tort, continuing violation doctrine, and whether or not that allowed them to avoid the effect of the statute of limitations by saying there was a continuous series of acts. That's exactly what it did. Hamer does not turn a moment in time into a violation, and that's what plaintiff's counsel is trying to do here is say the moment of time creates a violation, and more than that, if you look at the argument and you look at the words that are left out of his brief, he keeps talking about the disability, but it's not the disability that's the focus. It is the harm caused by the disability, and he wants this court to ignore the fact that you have to show there's some disability. We have had more cases than I can count with this firm on these issues, and they always tell me that each case is different. Each deaf person is individual and need to be treated differently. I accept that. If you put two, three, four people who are deaf in a room, some are going to have needs under certain circumstances and some aren't, and what he is saying is that there's been complex medical conditions or discussions that he did not understand and that somehow we were given notice that this was going on. Your Honors, I don't want to beat a dead horse at this point, but I think Mr. Desitel's effort to go in and set up the stage for providing any help that we could, and the Greer case, which I really think the Greer case has a tremendous quote in it, and we cited it to the court, and basically what it says is, in that case it was a football stadium, I believe it was, and the failure of the person to be accommodated, and the opinions basically says that asking a staff for a suitable accommodation is more consistent with the case law than remaining silent and resorting to Title II, in this case, Your Honors, Title III. That's exactly this case. It would have been a lot better if Mr. Francois had put the question I don't understand, or his grandmother had said, you know what, I think we need some help, but they didn't give us a chance to do the very thing that on the very first day we could talk to him, we said, we're here to do this, let us know if we can do it for you. Your Honors, there is no evidence of intentional discrimination, and we ask the court to affirm the trial court decision. Okay, thank you. Mr. DeRose. Good afternoon. So I think a large part of what this case comes down to is what affirmative obligations are born and by whom, right? And I think the case law from the Supreme Court itself saying that an N.A. has an affirmative obligation to accommodate, I don't think that can just be readily discarded and say, you know, Mr. Francois should have, you know, written a question mark. I mean, it's very easy to come up for a lawyer, to come up with arguments post hoc and say, well, this is what Mr. Francois should have done. His shrugging his shoulders was not sufficient. Think about the other way around. Mr. Francois could have written a question mark. What if that was ignored? Now we'd be seeing the same argument in reverse. Well, sure, he shrugged his shoulders, but he should have, you know, he should have done, or sure, he wrote a question mark, but he should have done more. I mean, I think the law, you agree the law, they either have to request it, and there's this whole body of law on the interactive process, or you say it has to be open and obvious, right? I mean, that's the two, you have to meet one of those, basically. A request or open and obvious. So this is all about open and obvious. Well, I don't know if I would say that, because here, Mr. Francois' grandmother did ask for an interpreter that first morning, right? And thereafter, his need for an interpreter did not change, right? It's not like he magically stopped needing an interpreter. And I think it's reasonable for Mr. Francois and his grandmother to assume that death hotel shows up after a request has been made, they're going to think, this guy's probably going to be coming back again, right? So why didn't he ask? There's no evidence in the record as to why Mr. Francois and his grandmother did not make a request in those four days. But again, whether he should have or shouldn't have is ultimately, we would say, an inference that should be decided by the jury as to whether he should have done more or not. I want to follow up on the question Judge Jones asked at the end of your first presentation. And you said, there's no more injunctive claim. So I take it there's only the damages claim, and you make this attack on Cummings. But if we say Cummings bars all your damages claims, and of course we can't revisit Cummings, then what's left of the case? Nominal damages? There's nominal damages. There's also the argument that plaintiff has made that Mr. Francois could pursue damages for self-determination damages. No, I know, but I'm saying if we were to say Cummings bars all that, there'd be nominal damages? There still would be, but I would note that the self-determination damages are not necessarily a type of emotional distress damages, because Cummings says you look at the restatement of contracts, and under the restatement of contracts, self-determination damages, you know, we cited some cases where, for example, you would have an expectation interest that a contract would be fulfilled in a certain way, such as the building of a house. And you go to the hospital, it would be reasonable to suspect that you would be able to communicate with your doctors and nurses, etc. Do you understand that theory? Do you have any ADA case law on self-determination? I don't, Your Honor. I would suggest that the Cummings case recently came out. This will be the first opportunity for a court to visit this argument about what sort of interest can be pursued. What do you say in response? Because I did think one of your points about damages was – or how he was harmed was that he didn't – they weren't telling him he was permanently paralyzed. What do you say in response to the other side saying that determination hadn't been made as a medical matter during these days in question? Well, I don't think that there's any evidence of that in the record, that that's not the case. And we don't also know that he wasn't told because there wasn't an interpreter. I mean it's partially a chicken and the egg sort of situation where why are the doctors not communicating with him? It could very well be because there was no interpreter so that they could communicate with him. So where it begins and ends I don't think is nearly as simple as counsel makes it out to be. Okay. Thank you very much. We have the argument. We are in recess until 9.